596 F.2d 99
 19 Fair Empl.Prac.Cas. 490, 19 Empl. Prac.
Dec. P 9097
Ollie T. HILL, John W. Ward, Charles R. Merriwether, Jr.,
Edward A. Minatee, Minnie Marbel, Mary E. Carter,
Individually and on behalf of all other
persons similarly situated, Appellees,
v.
WESTERN ELECTRIC COMPANY, INC., Appellant. The American
Society for Personnel Administration, Amicus
Curiae. Equal Employment Advisory
Council, Amicus Curiae.
 No. 76-2439.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 6, 1978.
Decided April 6, 1979.
 
 Thompson Powers and Kenneth I. Jonson, Washington, D. C. (Michael P. Berman, John R. Labovitz, Steptoe & Johnson, William G. Christopher, John M. Edsall, Washington, D. C., on brief), for appellant.
 Paul S. Reichler, Washington, D. C. (James A. Beat, Jeffrey A. Burt, Arnold & Porter, Washington, D. C., Geoffrey J. Vitt, Cohen, Vitt & Annand, Alexandria, Va., Elizabeth Rindskopf, Lawyers' Committee for Civil Rights Under Law, Washington, D. C., on brief), for appellees.
 William N. Ng, Atty., E. E. O. C., Washington, D. C. (Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, Charles L. Reischel, Asst. Gen. Counsel, E. E. O. C., Washington, D. C., on brief), as amicus curiae (Charles P. O'Connor, Harry A. Rissetto, Susan S. Sauntry, Morgan, Lewis & Bockius, Washington, D. C., on brief), for amicus curiae The American Society for Personnel Administration.
 Before HAYNSWORTH, Chief Judge, LAY* and RUSSELL, Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 Six black male and female plaintiffs instituted this class action against Western Electric, alleging that the company had engaged in a pattern of discrimination against blacks and females in hiring, in job assignments, and in promotions to salaried and supervisory positions in its facilities in Arlington, Virginia. The district judge upheld all of the plaintiffs' claims and granted extensive relief. Because no named plaintiff is a member of the excluded classes, we think the district court improperly considered the discrimination in hiring claims and the claim of discrimination against women in promotions in the Installation facility. We accept the findings of discrimination in job assignments in the Service facility as being not clearly erroneous, but we conclude that there was a failure to prove a Prima facie case of discrimination in promotions.
 
 
 2
 Western Electric has a Service Center in Arlington, Virginia. Its principal work is the repair, refinishing and reassembly of telephone sets and other telephone equipment. There is an area in the shop, however, called "Shop Trades" in which wooden and metal telephone booths are repaired, refinished and assembled, and miscellaneous other woodwork and metalwork is done there. Some fourteen wood and metal workers, all of whom are white males, were assigned to that work.
 
 
 3
 The work in the Service facility is supported by a warehouse and by an administrative and technical office, both of which are housed in the same building in which the Service shops are operated.
 
 
 4
 A small portion of the building is occupied by the administrative office of the Installation division. Only office workers are there. The installers, who work under that administrative unit, are engaged in installing switching and receiving equipment in business and professional establishments in the metropolitan Washington area.
 
 I.
 
 5
 The named plaintiffs are two black females employed in the Service Shop and four black males employed, or formerly employed, as installers of switching equipment in the Washington area. No one of the six was denied employment, and no one is a member of a class of black or female applicants who were denied employment allegedly on the basis of race.[1]
 
 
 6
 At the time of his decision, the district court had for guidance our opinion in Barnett v. W. T. Grant Company, 518 F.2d 543 (4th Cir. 1975). There we allowed Barnett to represent a class which included some people who had not been disadvantaged directly in the same way Barnett alleged that he had been disadvantaged. In footnote 4, however, we noticed the problem which is created when representatives are allowed to represent a class which includes people who have not been disadvantaged directly just as the representatives have been. We permitted it in that case, however, because Barnett sought to represent only persons seeking positions as over-the-road drivers and had not launched a general attack upon racial discrimination in the employer's other employment practices.
 
 
 7
 If Barnett arguably might authorize these named plaintiffs, who were employed, to represent unsuccessful applicants, who were denied employment, the basis for any such application was foreclosed by the Supreme Court's subsequent decision in East Texas Motor Freight v. Rodriquez, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). In Rodriquez, the Supreme Court emphasized that a class representative must "possess the same interest(s) and suffer the same injury" as the class members they seek to represent. All blacks and females have an interest in being free from discrimination in employment. In a very broad and loose sense, any member of any such class who suffers discrimination has the same interest as other members of the class who suffered discrimination in very different circumstances and by very different means, but clearly that is not the thrust of Rodriquez. The interest of these named, employed plaintiffs in being free of discrimination in job assignments and in promotions is so different in kind from that of people who were denied any employment that the named plaintiffs may not properly maintain an action for redress of alleged discrimination in hiring. Under Rodriquez, certification of a class including victims of alleged hiring discrimination who never were employed by Western Electric was in error.
 
 II.
 
 8
 If Rodriquez limited Barnett in application, it did not leave it a derelict. Under Barnett a named plaintiff may represent a class of persons whose injuries and interests are of a kind with the representative's. A person who has been injured by unlawful, discriminatory promotion practices in one department of a single facility may represent others who have been injured by the same discriminatory promotion practices in other departments of the same facility. In such a case, the representatives of the class all have the same interests in being free from job discrimination, and they have suffered injury in precisely the same way in the denial of promotion. Rodriquez did not require the fractionization of similar claims by a class of employees in a single facility, nor does it destroy the utility of the class action device by requiring separate suits on an episodic basis.
 
 
 9
 What is left of Barnett, however, is not broad enough to permit a named representative to represent a class of people who suffered different injury or those having similar claims but who are employed in other facilities. The Installation facility is not a single facility with the Service Shop. It is a separate one.[2]
 
 
 10
 It is true that the small office component of the Installment facility is located in the same building housing the Service Center, but the affected people, the installers, are not employed there. They do their work entirely in the field. Their job sites change. They range all over the area, and their work is done on premises belonging to others than Western Electric. There is no apparent basis for a finding that they have a community of interests with the employees in the Service Center.
 
 
 11
 In Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir. 1976), we treated two plants of the same employer as a single facility for the purpose of class action representation. There, the two plants were within a few blocks of each other. Each plant had a prefabrication department in which tobacco was mixed and blended, and it was principally the employees of those departments who complained of discrimination in promotion. We emphasized the fact that the two plants drew their employees from the same labor market, and, of course, they were drawn to do similar work.
 
 
 12
 In this case, however, though we may assume that the installers live in the same geographic area as the employees of the Service Center, that is, the entire metropolitan Washington area, they are not drawn from the same labor market as they were in Patterson. The work of the hourly paid employees of the Service Center is relatively unskilled, while the installers are engaged in installing, servicing and fixing sophisticated electronic equipment requiring many and varied skills. Newly employed installers are not required to have previous training or experience. After employment, they are given formal training and provided with experience. As new skills are acquired, they progress in five steps, each step being called an index, until the most skillful and experienced reach step 5. People with the gifts and ambition to become such technicians simply do not compete in the same labor market with unskilled workers.[3]
 
 III.
 
 13
 The plaintiffs first allege discrimination in the assignment of employees to jobs in Shop Trades, to jobs in the warehouse and to jobs in the office.
 
 A. Shop Trades
 
 14
 The employees holding jobs in Shop Trades have all been white males. Its foreman testified that on two different occasions when there were vacancies to be filled in Shop Trades, through other foreman in the Service Center, he invited a list of employees who might be interested in a transfer to Shop Trades. On each occasion he received a list with a substantial number of names upon it, and some of the listed people were black and some were female. All of them were interviewed and were allowed to see the jobs in which there were vacancies, but afterwards no one of those persons, black or white, male or female, was interested in actually being transferred. This is not inconceivable since woodworking and metalworking may require greater skills than most of the other jobs in the shop portion of the Service Center. Nevertheless, there is the fact that no black and no female had ever been assigned to one of these woodworking and metalworking jobs, and there is the testimony of the plaintiff, Marbel, that she sought a transfer to Shop Trades because people there progressed more rapidly to pay grade 3, but did not obtain it. Thus there is evidentiary support for the district judge's finding that there was both racial and sexual discrimination in job assignments to Shop Trades.
 
 B. Warehouse
 
 15
 The district court also found that the defendant had been guilty of illegal sex discrimination in making job assignments to warehouse positions in the Service Center. A position in the warehouse also had the advantage of a position in Shop Trades of a more rapid progression to pay grade 3 than for other employees in the shop of the Service Center.
 
 
 16
 It is clear that for many years Western Electric regarded the jobs in the warehouse as appropriate for men only. No woman was assigned to a job there until 1972, when only one was. From July 1965 through 1974, four hundred fifty-one persons have been hired for warehouse jobs, all but the one woman being men. Moreover, there was the testimony of the plaintiff, Marbel, that between 1966 and 1970 she sought a transfer to the warehouse, but did not obtain it.
 
 
 17
 The policy of exclusivity with respect to females in the warehouse was abandoned by 1972 when the one woman was employed. It may be, too, that the jobs in the warehouse may be heavy jobs, unsuitable for most women, but the fact that only one woman had been employed there between 1972 and the time of trial supports the finding of the district court that there was continuing sex discrimination in assignment of employees to the warehouse, if not a continuing policy of exclusivity.
 
 C. The Office
 
 18
 The district court also found racial discrimination in the assignment of blacks to the Service Center office. This was premised principally upon data showing that blacks had never constituted more than ten percent of the work force in the office, and that from 1965 to 1974 only 7.9 percent of the persons newly hired for office work were black. The trouble with those statistics, however, is that there is no differentiation between those jobs in the office for which employees in the shop might be qualified and those for which they are not. There are some positions in the office requiring little skill, but we are not told how many, or what proportion, of the people filling them are black. Nor is the void filled by the testimony of Ms. Marbel, who testified that when she initially applied she was told that there was no openings in the office for a clerk-typist, but that a white woman was employed for a position in the office, a position which the employer's records disclosed was that of a trained technician. The question now is one of job assignments of unskilled employees,[4] and there was simply no showing, Prima facie or otherwise, of any disparity in the assignment of blacks to those kinds of positions in the office.
 
 D. Remedy
 
 19
 Since we have held that there is a basis for the findings in the district court of racial and sex discrimination in the assignment of employees to Shop Trades and of sex discrimination in the assignment of employees to the warehouse, we generally approve the decree's provision for back and front pay for those individuals who can show they suffered deprivation by reason of such discrimination. We emphasize, however, that the burden must be upon the individual claimant to prove that he or she sought a position, or would have sought it had not an application been excused under the principle of International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, that the applicant was qualified to fill the position, having such skills and physical strength as were necessary for performance of the work, would have accepted the position had it been offered, and that there was an available position which was filled by someone else in conformity with the discriminatory policy.
 
 IV.
 Promotions
 
 20
 The district court found discrimination in promotions.
 
 
 21
 In the Service Center, the usual progression from hourly rated jobs to supervision was by way of intermediate salaried, non-supervisory positions in the office. Section Chiefs, the lowest level supervisors, were drawn almost exclusively from salaried office workers who had been promoted from hourly rated jobs in the shops or warehouse. The district judge found discrimination at both promotional levels and that the victims included both blacks and females.
 
 
 22
 The district court also found discrimination against blacks and females in promotions at Installation. There, the Section Chiefs were selected by supervisors from among the installers who had achieved at least Index 4.
 
 
 23
 The court ordered extensive relief. A Special Master was appointed to hold hearings, to identify victims of discriminatory promotional practices and to award them back and front pay. Western Electric was required to make priority promotional offers to such identified discriminatees, after which a system of quotas was imposed upon the employer in making promotions. Subject to a stated availability of qualified persons, promotions to salaried non-supervisory office positions in the Service Center were to be at the ratio of at least two blacks for every one other employee so promoted, and of at least three females to every two males. For the positions of Section Chiefs in the Service Center and in Installation, the ratio was two blacks for every other employee. In the Service Center, Western Electric was required to promote three females to supervisory positions for every two males, while in Installation the ratio was to be one female for every two males, though at the time of the decree there was no female installer.
 
 
 24
 In every instance, the quotas were to remain in effect until the percentage of blacks and females in the promotional positions "approximates cumulative applicant pool proportions from the previous four (4) years."Thus the quotas placed upon the promotion of hourly rated employees to upper level and supervisory positions were not referable to the pool of experienced employees, or even to the pool of all employees, regardless of experience. They were referable to the applicant pool.
 
 
 25
 While the quotas which were ordered were referable to the applicant pool, the initial finding of discrimination is promotion was premised upon a finding of disparity in the number of blacks and females promoted in comparison with the number of blacks and females in the hourly paid work force. Such a comparison, of course, treats the recently employed person in an entry level job as qualified for promotion to a salaried job in the office at the Service Center or to a supervisory position. In the Service Center, for instance, only 10% Of those in hourly paid jobs in 1965 were black. The number of whites employed in such positions declined from 555 at the end of 1965 to 492 at the end of 1973, while the number of blacks in such positions increased from 62 in 1965 to 227 at the end of 1973. At the end of 1973 blacks constituted 31.6% Of the employees in hourly paid jobs, and an average for the nine year period produced a figure of 26.4% Black work force. The court found that 26.4% Of those available for promotion were black and disparity between that figure and the fact that of those promoted to salaried jobs, only 9.8% Were black. Similarly, the number of females employed in hourly rated jobs in the Service Center increased from 85 in 1965 to 161 at the end of 1973, an increase from 13.8% Of the work force to 22.4% Of the work force. The average for the nine years was found to have been 18.8%, and it was found that females constituted 18.8% Of those available for promotion, while only 11.9% Of those actually promoted were female.
 
 
 26
 Thus, the findings of disparity and discrimination in promotions of both blacks and females were premised upon an assumption that all employees in hourly rated positions constituted the available pool from which persons promoted to salaried positions were to be drawn. This necessarily included those in entry level jobs, those with little experience and little skill. There was no attempt to identify an available pool based upon experience or a combination of skill, experience and job performance or any other criteria which an employer might find relevant to decisions about promotions.
 
 
 27
 The assumption that minimally qualified hourly rated employees were qualified for promotion to a salaried position is simply unfounded. The district court was probably misled by a stipulation that prior experience was not a requisite for supervisory positions. The stipulation in turn was probably the consequence of the fact that at Installation three college graduates, without prior experience as installers, had been made Section Chiefs in Installation pursuant to a college graduate development program. Though they had no prior experience as installers, this in no way suggests that an untrained, unskilled person, seeking employment in the jobs requiring the least skill, is immediately qualified for a high level salaried job or for supervision. Common experience belies the assumption. We do not employ babes at high salaries to lead men doing hourly rated work. In higher educational institutions, people with unusual capabilities may be trained for the performance of supervisory roles. When, however, the pool from which supervisors are to be selected is the hourly paid work force, one naturally and inevitably looks to those who have acquired experience and demonstrated skills. The greater the experience and the greater the number of demonstrated skills, the more appropriate it is for consideration to focus upon a particular individual. One does not look for supervisors at the bottom rung of the ladder; it is at the top where any search may be expected to produce fruitful results.
 
 
 28
 In Roman v. ESB, Inc., 550 F.2d 1343 (4th Cir. 1976), we held that an employer was entitled to adopt selection standards based upon demonstrated ability, proper qualifications, experience and length of service and to consider such things as job performance, willingness to accept responsibility and dependability. In Patterson v. American Tobacco Co., 535 F.2d 257 (4th Cir. 1976), we held that the ratio of blacks and females in supervisory positions should be judged on the basis of their ratio in the qualified work force, and that a standard might be found in SMSA data. In the Washington SMSA this would yield a ratio of 4% Blacks and 10% Females in Western Electric's Section Chief positions.
 
 
 29
 That experience was an essential requirement for promotion from hourly rated jobs is indicated by the fact that from July 1965, when Title VII became effective, those persons promoted to Section Chief in the Service Center had an average of 15.3 years experience, while those in Installation had an average of 14.8 years experience. Some at each facility had been promoted with less than the average experience, but the least in the Service Center was more than six years, while the least in Installation was more than eight years. Of all those promoted to Section Chief jobs, 79% In the Service Center and 77% In Installation had ten or more years experience. There was testimony that experience was an important factor in the process of selecting people for promotions, as were job knowledge, skills, a sense of responsibility and attendance dependability.
 
 
 30
 If the ratio of blacks and females in all hourly rated jobs is disregarded, as it must be in considering promotions, what remains in the record is insufficient to show any disparate impact upon blacks and females. From mid-1965 through 1973, of those promoted to salaried positions in the Service Center, 9.8% Were black and 11.9% Were women. The Washington SMSA data suggests only 4% Black and only 10% Female. In 1965 blacks represented only 10% Of the hourly paid work force, and that proportion grew to 31.6% At the end of 1973. Only 9.8% Of those promoted to salaried positions in the Service Center through 1973 were blacks, but only 7% Of the blacks in the hourly paid work force at that time had as much as ten years experience. Of those promoted to salaried positions in the Service Center, 11.9% Were female. There is in the record a table showing that 15% Of the females employed in non-supervisory, non-professional positions in the Service Center had as much as ten years experience, but that table includes women employed in the office and the people in non-supervisory salaried positions. There is no data reflecting the work experience of the hourly paid female employees in the Shop.
 
 
 31
 Of those promoted to Section Chief in the Service Center since July 2, 1965, 8% Were black and 5.4% Were female. The number of blacks substantially exceeded the SMSA comparison, while the number of females was substantially deficient. The comparison is quite imperfect, however, for the salaried employees constituted the pool from which promotions to Section Chief were made, and there is nothing in the record permitting a comparison of the number of males and females promoted to Section Chief out of that portion of the pool which became salaried on or after July 2, 1965. The number of persons already in the pool on that date necessarily greatly distorts any comparison.
 
 
 32
 In Installation, only one black had been promoted to Section Chief, and, in a period of general curtailment and reduction in force, he was demoted to an Index 5 installer.[5] While there are figures showing the racial composition of the installers, there are no such figures for Index 5 or for Index 4, from which the Section Chiefs were drawn. There are data indicating that only four blacks achieved Index 5 during the period July 1965 through 1971, but that figure is of no assistance without complete data about all promotions to Installation Section Chief and the racial composition of the pool from which the Section Chiefs were drawn.
 
 
 33
 Thus there was a total failure of proof of any disparate effect in promotions upon blacks or women in the Service Center or upon blacks in Installation.V.
 
 
 34
 Our conclusion is that on this record a finding of discrimination against blacks and females is warranted only in job assignments to Shop Trades and against females in job assignments in the warehouse in the Service Center. Upon remand, the district court should frame an appropriate decree consistent with this opinion, granting appropriate relief with respect to those job assignments. In all other respects, the findings of discrimination are vacated.
 
 
 35
 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 
 
 36
 LAY, Circuit Judge, concurring in part and dissenting in part.
 
 
 37
 I concur in the majority's affirmance of the trial court's finding of discrimination in job assignments. Likewise, I concur that plaintiffs lack standing to challenge Western Electric's hiring practices and the alleged sex discrimination in promotions in the Installation facility.
 
 
 38
 I must voice vigorous disagreement, however, with the reversal of the district court's findings of discrimination relating to the other promotion practices of Western Electric. I agree with the trial court's finding that plaintiffs not only established a prima facie case of discrimination but also presented strong evidence which amply demonstrates that the facially neutral promotion practices have a disparate impact on blacks and female employees entitling them to the remedial relief.
 
 
 39
 The trial court's opinion adopts as statistical support for its disparate impact finding the data set forth in plaintiffs' Proposed Findings of Fact (PP 104-110). These statistics establish:
 
 
 40
 1. While blacks constituted 26.4% Of those available for promotion from hourly-rated to salaried nonsupervisory jobs, only 9.8% Of those promoted were black;
 
 
 41
 2. While females constituted 18.8% Of those available for promotion from hourly-rated to salaried nonsupervisory jobs, only 11.9% Of those promoted were female;
 
 
 42
 3. Only 2.8% Of the nonsupervisory employees promoted to installation supervisory jobs were black, even though blacks comprised as much as 23% Of the work force from which such promotions were made during this period, and no females were promoted to these supervisory jobs;
 
 
 43
 4. Only 8.9% Of the nonsupervisory employees promoted to service center supervisory jobs were black, and only 5.4% Were female, even though blacks constituted as much as 26% And females 27% Of the work force from which such promotions were made during this period.
 
 
 44
 Thus, the district court relied on the disparities between the percentages of blacks and females in the pool of employees eligible for promotion to salaried and supervisory positions and the percentages of blacks and females actually promoted to such positions.
 
 
 45
 The majority opinion advances two sets of statistical data which allegedly provide a more accurate basis for assessing the impact of Western Electric's promotion practices. First, the majority suggests the Washington SMSA statistics Might contain a more appropriate standard of comparison. SMSA figures would yield a ratio of 4% Blacks and 10% Females in Western Electric's salaried and section chief positions. When these percentages are compared to the proportions of blacks and females actually promoted, the conclusion is drawn that no disparate impact exists. In addition, the majority opinion utilizes statistical data which suggests that an employee should have at least ten years experience to be qualified for promotion to salaried positions in the Service Center. Since only 7% Of the blacks and 15% Of the females in the hourly work force in 1973 had the requisite experience, it is argued that the statistical data offered by plaintiffs fails to establish even a prima facie showing of disparate impact. From the foregoing it is concluded that the trial court erred and that there was a "total failure of proof of any disparate effect in promotions upon blacks or women in the Service Center or upon blacks in Installation." Ante at 106.
 
 
 46
 The trial court considered the efficacy of using SMSA statistics and experience-related data to determine whether a prima facie showing of discrimination was made. In properly rejecting the SMSA data, Judge Bryan observed:
 
 
 47
 The facility in question is located in Arlington County, Virginia, a largely residential suburb of the District of Columbia. The Washington SMSA includes not only Arlington County, but the District of Columbia, the Cities of Alexandria and Falls Church, the Counties of Fairfax, Loudoun and Prince William in Virginia, and the Counties of Montgomery and Prince Georges in Maryland. This is too large an area to be considered as the area from which an employer, situated as the defendant is here, draws for its labor market. Here the entry level jobs at both units are, except for secretarial employees, for the unskilled, and the census data does not provide an accurate or reliable indication of persons who are available for work in a particular job with a particular employer. Insofar as vocational and occupational data are concerned, the census data does not, of course, take into account existing discrimination.
 
 
 48
 Hill v. Western Electric Co., 12 FEP Cases 1175, 1179 (E.D.Va.1976).
 
 
 49
 It is difficult for me to understand how the over-inclusive census statistics contained in the Washington SMSA can be considered more probative to the issue at hand than the actual work force from which the promotions are made at the specific plant in question.
 
 
 50
 The majority opinion does not rest on the SMSA statistics alone, but rather relies primarily on the experience-related data to support its conclusion that no disparate impact was proven. The majority's use of the lengthy-experience "requirement" reflects a fundamental misconception regarding the proper order and nature of proof in disparate impact actions under Title VII.
 
 
 51
 As previously noted, the trial court Did consider the "experience" claims of Western Electric when determining whether discrimination existed. The promotion practices utilized by Western Electric, however, precluded an initial precise definition of the pool of qualified employees. Under Western Electric's promotion procedures, employees had to be placed on a list by their section chief in order to be eligible for promotion. Western Electric provided the section chiefs no written guidelines setting forth the qualifications necessary, or the criteria used, for promotion of employees. The factors employed by the section chiefs in determining whether to place an employee on the list were vague and subjective. Furthermore, Western Electric stipulated that no specific number of years of experience is necessary to be qualified for promotion. Accordingly, the trial court used the racial and sexual composition of the entire hourly-employee work force as the Most probative labor market percentages. At this juncture, the "experience" needs of Western Electric were properly addressed by the trial court to determine whether Western Electric successfully Rebutted the prima facie showing of discrimination. In light of the fact that Western Electric had totally failed to apprise section chiefs of any promotion qualification requirements, the order in which the trial court evaluated the proof was clearly justified.[1]
 
 
 52
 The trial court's inquiry did not begin and end with the statistical data. Judge Bryan properly allowed Western Electric to present evidence which would cast doubt on the propriety of using the entire hourly-wage work force in determining whether promotion practices had a disparate impact on blacks and females. Western Electric strenuously argued before the trial court that experience is relevant in making promotion decisions. In assessing the credibility of the "experience defense" proffered by Western Electric, the trial judge noted that a lengthy-experience requirement could be used to perpetuate discrimination in hiring. Although plaintiffs have no standing to launch a frontal assault on Western Electric's hiring practices, the trial court could legitimately consider evidence of such discrimination when evaluating the experience claim.[2] See Rowe v. General Motors Corp., 457 F.2d 348, 356 (5th Cir. 1972); Cf. Hazelwood School District v. United States, 433 U.S. 299 at 309 n. 15, 97 S.Ct. 2736, 53 L.Ed.2d 768. Furthermore, contrary to the majority's conclusion, the relevance of experience in determining whether an employee is qualified for promotion is not overlooked in the trial court's remedial order, nor is it necessarily obviated in the master's duty to award back pay related to promotional transfers.[3]
 
 
 53
 In addition, in rejecting the experience factor as a threshold issue, the district court viewed not only the statistical proof but also the overall record regarding the subjective employment practices in which promotions were made. I think it significant to highlight this other evidence, not otherwise discussed in the majority opinion. Judge Bryan, in an exhaustive and analytical opinion, wrote:
 
 
 54
 Promotion Service Center.
 
 
 55
 Promotion within hourly positions is done strictly by departmental seniority unless an individual is determined to be unqualified. As yet, no one has ever been found to be unqualified.
 
 
 56
 The potential problem with this scheme of promotion is that it perpetuates past discrimination and reflects discrimination in original hiring. The fact that promotions are always made from within the particular section in which the vacancy occurs adds to this, since transfer among sections is prohibited. However the Court does not find any discrimination in the System of promotion.
 
 Hourly to Salaried Non-Supervisory
 
 57
 Promotion of hourly workers to salaried non-supervisory positions is made from a list of recommended employees. The initial recommendation to place an employee upon the list is made by the section chief. This recommendation is reviewed by two higher supervisory levels. The specific promotion recommendation is made by an advancement committee but sometimes by the section chief. The final decision to promote is made by the assistant manager and manager.
 
 
 58
 The statistics support, and the Court finds an adverse impact on blacks and females and discrimination in this class of promotion (Plaintiff's Proposed Findings of Fact PP 104-110). The promotional procedure itself is supportive of the Court's finding, because an employee cannot be promoted unless he is placed upon the list and the only way that can be done is by the section chief. Section chiefs are given no written guidelines for this task and the factors employed by the section chiefs are necessarily vague and subjective. Additionally, vacancies are not posted and there is no way for an individual to apply for a particular position. The section chief's decision is final and unreviewable.
 
 Non-Supervisory to Supervisory
 
 59
 Supervisory promotions are made from a Management Potential Inventory. In order to be listed, an employee must first complete a request form. Annually, all supervisors meet and there determine who shall be placed upon the list. The actual promotion decision is made and reviewed up four levels of supervisory command.
 
 
 60
 The statistics from 1965 support a charge of discrimination (Exhibit P-243). In addition, the promotion procedure is subject to most of the same objections as "Hourly to Salaried Non-Supervisory." The process is basically informal and non-structured. There are no written guidelines for evaluating potential supervisory personnel and the promotion decision is based upon the subjective evaluations of supervisors. The process is secret vacancies are not posted and no one is allowed to "apply" for a job, only the list.
 
 
 61
 The defendant seeks to offset the plaintiff's statistics with statistics of its own. No one has been promoted since 1972. In 1972, five people including 1 black and 2 females were promoted. Defendant claims that the overall disparate statistics are due to the fact that generally, only those employees with ten or more years of experienced (sic) are promoted. Only one person hired since 1965 a woman has been promoted to supervisor. Nevertheless, the statistics are such that they cannot be explained away in this manner. They result, the Court finds, from past discrimination, and warrant, at the very least, injunctive relief.
 
 
 62
 Promotion Installation.
 
 Supervisory Positions
 
 63
 Annually, the department chiefs and the district manager select names of non-supervisory employees and place them on a Management Potential Inventory. When a supervisory vacancy occurs, an employee is selected from this list to fill it.
 
 
 64
 The statistical evidence supports a finding of discrimination. There has only been one black and no female supervisors. The defendant once again asserts that length of employment is the basic criterion for promotion. In addition, there have been only five promotions since 1970 and none since 1973. In fact, since 1972 there has been a net downgrading from supervisory to hourly of 28 positions.
 
 
 65
 The objections to the actual promotion procedure are similar to those for the Service Center. An employee must be recommended to be placed upon the Management Potential Inventory; and this decision is unstructured and subjective. Again, as in the case of the Service Center, injunctive relief is warranted.
 
 
 66
 12 FEP Cases at 1181-83.
 
 
 67
 In view of this additional evidence and the exhaustive and specific findings of fact by the trial court, I find it difficult to say there is a total failure of proof by plaintiffs to show discrimination in promotional practices. Even if it is assumed that the statistical comparison employed by the district court fails to furnish a precise measure of Western Electric's conduct, the additional findings made by the trial court warrant injunctive relief. As this court stated in Patterson v. American Tobacco Co.:
 
 
 68
 The fact that the company's appointments since 1965 exceed the ratio of qualified blacks and women in the workforce does not exonerate the company for the violations of the Act which the district court found. The tardy appointments of blacks and women to supervisory positions long after the passage of Title VII and the present lack of published job descriptions and objective selection procedures fully justify the injunctive relief the district court ordered.
 
 
 69
 535 F.2d at 275.
 
 
 70
 Any number of cases, including decisions of this circuit, have emphasized that subjective practices utilized by defendant constitute strong evidence of discrimination. See, e. g., Parson v. Kaiser Aluminum & Chemical Corp., 575 F.2d 1374, 1384-85 (5th Cir. 1978); Roman v. ESB, Inc., 550 F.2d 1343, 1351 (4th Cir. 1976); Stewart v. General Motors Corp., 542 F.2d 445, 450-51 (7th Cir. 1976), Cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); Patterson v. American Tobacco Co., 535 F.2d at 272-73; Muller v. United States Steel Corp., 509 F.2d 923, 928 (10th Cir.), Cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); United States v. N. L. Industries, Inc., 479 F.2d 354, 368 (8th Cir. 1973); Rowe v. General Motors Corp., 457 F.2d at 358-59.
 
 
 71
 For the foregoing reasons, I would defer to the trial court's careful analysis.
 
 
 
 *
 Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 One of the women plaintiffs, employed in the Service Shop, testified that she first sought employment as a clerk-typist in the office but was told there was no vacancy in the office, though another white girl who was seeking employment at the same time was given a job in the office. The records of Western Electric indicated that the only woman employed in the office within two months of the date of that plaintiff's employment was, indeed, a white woman with technical skills, and she was employed as a technician, not as a clerk-typist. Under the circumstances, the fact that this plaintiff was offered a job in the shop rather than as a clerk-typist, does not suggest that she had been denied employment because of her race
 
 
 [2]
 There have been no women installers, so there are no installers who may assert a claim of discrimination in job assignment or promotion in the Installment facility. Since the district court granted affirmative relief against sex discrimination in promotions in the Installment facility, however, it is not inappropriate to consider its separateness
 
 
 [3]
 The named plaintiff who testified about her wish to become a clerk-typist and to be transferred to Shop Trades and to the warehouse, testified that she was trained do her first job in the service shop in approximately two hours. Later she was trained to do other jobs in the shop, and each time the training consisted of her being shown by an hourly rated employee how to do it. In contrast, the installers receive formal training as they progress to the fifth step in the rating of skills
 
 
 [4]
 As indicated above, the question of possible discrimination in hiring is not now before us
 
 
 [5]
 There was a finding that this demotion was not discriminatory. Other installer Section Chiefs were also demoted
 
 
 [1]
 Assuming, as the majority opinion apparently does, that ten years of experience was the prerequisite for promotion, plaintiffs could have attacked that qualification requirement as a facially neutral employment practice having a disparate impact on blacks and females. The statistics relied on by the trial court clearly support such a claim. Western Electric would then have been required to show that such a stringent experience requirement was justified by "business necessity." See Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In the instant case, however, plaintiffs can hardly be faulted for not directly attacking a job qualification requirement which Western Electric stipulated did not exist. Furthermore, in suggesting the ten year statistics as a basis for comparison, the majority suggests a defense which Western Electric candidly denies. Western states in its brief:
 Western does not contend that it established the "business necessity" of A particular number of years of experience as a qualification for promotion, but that Experience is relevant to the threshold inquiry of whether Western's promotion practices have had an adverse impact.
 Reply Brief of appellant at 19 (emphasis added).
 I would make one additional comment on the majority's treatment of the experience factor. By using ten years experience as the factor which defines the qualified work force, the majority, in effect, evaluates lengthy experience to a promotion qualification. The majority opinion justifies this conclusion by noting that "one naturally and inevitably looks to those who have acquired experience and demonstrated skills" when selecting supervisors. Ante at 105. The fact that an employer would probably look to its experienced employees when determining who should be promoted may negate an inference of discriminatory intent, but it does not resolve an adverse impact claim. By definition, an adverse impact cause of action arises when job qualifications which are facially neutral and neutral in terms of intent fall more harshly on minorities. See, e. g., Griggs v. Duke Power Co., supra; Stewart v. General Motors Corp., 542 F.2d 445, 450 (7th Cir. 1976), Cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977); Patterson v. American Tobacco Co., 535 F.2d 257, 268 (4th Cir.), Cert. denied, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); United States v. Dillon Supply Co., 429 F.2d 800, 804 (4th Cir. 1970). When examining such job qualifications
 the applicable test is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact.
 Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971), Cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1972).
 
 
 [2]
 To support its finding of discrimination in hiring the trial court relied on the following:
 (a) Only 12.7% Of the black applicants for entry-level jobs in defendant's Service Center from 1970 through 1974 were hired as compared to 29.8% Of the white applicants; while 1,489 of the 3,382 applicants (or 44.4%) were black, only 189 of the 754 applicants hired (or 25.1%) were black.
 (b) Only 17.9% Of the black applicants for entry-level jobs in defendant's installation organization from 1968 through 1971 were hired as compared to 45.7% Of the white applicants; while 1,293 of the 2,760 applicants (or 46.8%) were black, only 232 of the 903 applicants hired (or 24.7%) were black.
 (c) Only 16.9% Of the female applicants for entry-level jobs in defendant's Service Center from 1970 through 1974 were hired, as compared to 26.8% Of the male applicants; while 1,443 of the 3,511 applicants (or 41.1%) were female, only 244 of the 799 applicants hired (or 30.5%) were female.
 
 
 [12]
 FEP Cases at 1179
 
 
 [3]
 With regard to priority promotions, the trial court's remedial order states:
 Promotion shall be offered only to those eligible claimants who are employed at the time by the defendant, and who are qualified on a job-related, non-discriminatory basis.
 If a claimant is found to be eligible by the Master, but subsequently is found to be unable to perform the duties of a position at the time the defendant otherwise would be required to make a priority offer of that position to that claimant, no obligation to make such an offer shall be imposed on defendant.
 With regard to back pay, the order states:
 (T)he Master may take into account the eligible claimant's actual employment history and such other factors as he may deem relevant to that claimant's performance potential, and may adjust the formula figure up or down accordingly, stating the reasons for such adjustment.
 Defendant shall have the opportunity to seek reduction of the net back pay award for each eligible claimant by showing higher actual earnings, or earnings obtainable through due diligence, or demonstrable factors probative on the question of how the claimant might have performed had no discrimination occurred.