Alfreta JONES, Sherry W. Antone, Sharon Denise Leak, et al., Plaintiffs,

v.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF WINSTON-SALEM, Defendant.

No. C-79-773-WS.

United States District Court, M. D. North Carolina, Winston-Salem Division.

Sept. 7, 1982.

Harvey L. Kennedy & Harold L. Kennedy III, Winston-Salem, N. C., for plaintiffs.

Fred Hutchins, Jr., Richard Bennett & William Kearns Davis, Winston-Salem, N. C., for defendant.

## MEMORANDUM OPINION

ERWIN, District Judge.

### Introduction

Alfreta Jones, Sherry W. Antone, and Sharon Denise Leak filed this action on December 21, 1979, contending that the defendant First Federal Savings and Loan Association of Winston-Salem (First Federal) discriminated against them because of their race and sex, in alleged violation of Title VII of the Civil Rights Act of 1964, as amended; 42 U.S.C. § 1981; 42 U.S.C. § 1983; and the Equal Pay Act of 1963.

The plaintiffs charged across the board discrimination by First Federal in (1) promotions, (2) job assignments, (3) pay, (4) hiring, and (5) various tangential job benefits. The plaintiffs further sought to represent a class composed of:

"All black and female persons who are now employed, were employed, might have been employed or might become employed by First Federal Savings and Loan Association of Winston-Salem at its offices since July 2, 1965, and who have been, and continue to be or might be adversely affected by the practices complained of herein."

The plaintiffs' motion for class certification was heard by this court on July 30, 1981 and was denied on August 26, 1981. After this case was noticed for trial, the plaintiffs filed a motion for reconsideration of class certification, this time attempting to represent a class composed solely of blacks.

Prior to trial, the court granted the defendant's motion for summary judgment as to the plaintiffs' claims concerning tangential job benefits[1] and 42 U.S.C. § 1983.[2]

---

1. The plaintiffs had charged that First Federal discriminated in the areas of maternity benefits, insurance, and pension plans. Subsequent discovery revealed, however, that discrimination concerning those benefits was not a viable issue in this case.

2. Title 42 U.S.C. § 1983 requires that any alleged deprivation of a federal right must have been carried out by a person or entity acting under color of state law. First Federal is a private entity and, thus, the plaintiffs could have no valid § 1983 claim against it. *Trivett*

The court also denied a number of motions for intervention filed by the plaintiffs over a period of time after the plaintiffs' motion for class certification was denied.

The case was tried by the court on the plaintiffs' individual claims of discrimination, beginning June 10, 1982. The plaintiffs again moved for class certification at the close of the case. Based upon the testimony and the documentary evidence, the court makes the following findings of fact and conclusions of law.

## Findings of Fact

1. Alfreta Jones is a black female who was employed at First Federal from April 12, 1976 through September 20, 1978. Sherry Antone is a black female who was employed at First Federal From March 5, 1974 to June 1977. Sharon Leak is a black female who applied for employment at First Federal in 1978 and in 1979, but was not hired.

2. First Federal is a savings and loan association doing business in Winston-Salem and Mocksville, North Carolina. The association operates a main office in Winston-Salem, four branches in Winston-Salem, and a branch in Mocksville.

3. First Federal averaged approximately sixty employees from January 1976 through April 1, 1980, the relevant period for purposes of this action.

4. All employment decisions at First Federal during the relevant period were made by Ms. Gaynelle Hutchens, Senior Vice President, and Mr. William White, President. Ms. Hutchens hired entry-level employees. Mr. White hired management employees.

5. First Federal hired most of its work force through "walk-in" applicants. It utilized the Employment Security Commission and other employment agencies when necessary.

*v. Bank of Delaware,* 421 F.Supp. 827 (D. Del. 1976); *Vazques v. Bayamon Federal Savings and Loan Association,* 506 F.Supp. 113 (D. Puerto Rico 1980).

6. When a vacancy occurred in an entry-level position, notices were not posted of such vacancies. Ms. Hutchens testified that she generally considered applications on file for the last three to six months. Positions at higher levels were generally filled from within, although a branch manager from outside First Federal was hired for the Mocksville office.

7. Ms. Hutchens testified that in filling vacancies, she considered an applicant's education, including specific courses taken, and previous employment experience. An interview was necessary before an applicant was hired. Occasionally, applicants were hired without financial experience, although applicants with savings and loan experience are considered very strongly.

8. First Federal adopted job grades and written job qualifications in 1976.[3] The written qualifications were the optimum qualifications for each position.

### Alfreta Jones

9. Alfreta Jones was hired on April 12, 1976 as a mail clerk.

10. At the time she was hired, Ms. Jones was a high school graduate who had worked for about nine years as a production worker at Western Electric. She had no prior clerical or financial experience.

11. At the time she was hired, Ms. Jones was studying business administration at Forsyth Technical Institute in Winston-Salem. She received an associate degree from Forsyth Tech in May 1978.

12. As a mail clerk, Ms. Jones was responsible for receiving mortgage payments (by mail) from customers and recording and preparing lists of those payments for First Federal's records.

13. Ms. Jones was busiest on the first ten business days of each month. After that time, Ms. Jones worked on occasion as a teller and receptionist, assisting and filling in for other employees.

**3.** Plaintiffs' Exhibits Nos. 25 and 26.

14. Ms. Jones was promoted to the position of loan secretary around July 4, 1977. Messrs. Thomas Stevenson and Mac Davis were her supervisors.

15. As a loan secretary, Ms. Jones typed and prepared loan documents for loan officers. She also called to obtain credit reports on loan applicants.

16. Ms. Jones testified that she did well as a loan secretary, but Ms. Hutchens and Mr. Stevenson testified that she made errors in typing, which necessitated proofreading of her work. A written evaluation of Ms. Jones acknowledged these errors but gave her credit for initiative and willingness to work. The evaluation noted that Ms. Jones "lacked experience." [4]

17. Ms. Jones approached Ms. Hutchens in June 1978, about the time that she received her degree from Forsyth Tech, to ask her about promotional opportunities. Ms. Jones indicated an interest in becoming a branch manager. There is conflicting testimony on this point. Ms. Jones testified that Ms. Hutchens told her she had gone as far as she was going to go at First Federal. Ms. Hutchens testified that she told Ms. Jones that it took a lot of experience to be a branch manager and that Ms. Jones had not yet gained that experience. The court concludes that Ms. Jones was told at that time that she lacked the experience to be a branch manager.

18. Ms. Jones remained in the position of loan secretary until September 20, 1978, when she resigned in order to be employed by McLean Trucking Company. She had given notice of termination to be final effective September 22, 1978, but was asked to leave earlier by Ms. Hutchens.

19. Ms. Hutchens testified that she asked Ms. Jones to leave early because she had determined that Ms. Jones was no longer effective in her job. Ms. Hutchens noted that Ms. Jones' performance and attitude toward her job deteriorated after their conversation in June 1978.

20. Mr. Stevenson also testified that Ms. Jones' performance deteriorated in the months before she left. He testified that he spoke with Ms. Jones about this on at least one occasion.[5]

21. On September 20, 1978, there developed a controversy as to whether Ms. Hutchens could tell Ms. Jones to sit in for the receptionist during a lunch break. Ms. Jones testified that she told Ms. Hutchens that she had to ask Wayne Whitaker, another bank officer, for permission first. Ms. Hutchens testified that she was Mr. Whitaker's superior. Ms. Jones indicated that she was unaware of that fact.

22. Ms. Jones alleged that First Federal discriminated against her by failing to promote her to a number of higher positions in the institution. She testified at her deposition that she "could have been trained ... for upward management, anywhere from a branch officer to an officer of the company." At trial, Ms. Jones testified that given the opportunity, she would have applied for a position in the bookkeeping department, as loan officer, in personnel, or as a branch manager.

23. Ms. Jones named a number of white employees whom she considered to have been treated better than she, both in hiring and in promotions. She was not, however, personally aware of their qualifications, nor did she dispute First Federal's enumeration of those qualifications. Ms. Jones named Ms. Teresa Burger, who was hired as a teller; Ms. Linda Strader, who was hired as a loan secretary and then became a loan officer; Ms. Rebecca Hartsoe, hired as a teller; Ms. Dale Cox, hired as a teller; and Ms. Jacqueline Bowers, hired as a teller. She also named Ms. Brenda Kirby, who was promoted from loan secretary to loan officer.

24. First Federal provided information about these individuals which was not disputed by either of the plaintiffs. Ms. Burger had apparently had five years of experience prior to coming to First Federal. Ms.

**4.** Defendant's Exhibit No. 1: File of Alfreta Jones.

**5.** Defendant's Exhibit No. 1.

Strader had worked for First Federal previously and at Mocksville Savings and Loan. Ms. Cox had been at First Federal since 1971 and left during 1975. Ms. Bowers had two years of college and worked at Wachovia Bank and Trust Company for six years as a teller. Ms. Kirby had been with the company since 1967.

25. Although they were not all mentioned during her trial testimony, Ms. Jones offered as exhibits the applications of individuals who are alleged to have been hired or promoted with less qualifications than she had.[6] The individuals were Ms. Terri Hensley Dodson, Ms. Kathy Foster Hayes, Ms. Teresa Burger, Ms. Rebecca Hartsoe, Ms. Jacqueline Bowers, Ms. Marilyn Camp, Ms. Deborah Nuckols, and Mr. Gary Lee Bumgardner.

26. Ms. Dodson was hired as a teller on March 13, 1978. Ms. Dodson was moved to a branch office with no pay increase on June 14, 1978. Her previous experience included being a cashier and doing teller work for eight months at a bank in Virginia.

27. Ms. Hayes was hired as a teller in the Mocksville branch on June 20, 1977. She resigned on June 30, 1978 and was rehired on September 28, 1978. She was a high school graduate and had worked as a legal secretary for four years, and at a real estate company where she did filing, typing, and accounting work.

28. Ms. Burger was hired as a teller on October 25, 1976. Her prior experience included several years as a cashier and a little over a year as a reservations clerk for Piedmont Airlines.

29. Ms. Hartsoe was hired as a teller on November 16, 1977 and was moved to a branch on April 17, 1978. She was a high school graduate whose prior work experience consisted of working at Hartsoe Motors doing typing, filing, answering the telephone, and doing credit reports. She was enrolled at Forsyth Technical Institute.

30. Ms. Bowers was hired by First Federal as a teller on February 20, 1978. She was promoted to branch teller on May 22, 1978. She was a high school graduate who had seven months' experience as a teller with Wachovia Bank and Trust Company.

31. Ms. Camp was hired as a teller in First Federal's Mocksville office on August 7, 1978. She was a high school graduate whose prior experience consisted of about six years in photography studios as a receptionist who also worked with sales and bookkeeping.

32. Ms. Nuckols was hired as a teller in Mocksville on August 7, 1978. She was a high school graduate who had worked at a number of other banks as a teller and proof clerk prior to coming to First Federal.

33. Mr. Bumgardner was hired as a teller on May 8, 1978. He had an associate degree in business administration from Forsyth Technical Institute. His work experience consisted of being a manager at the Winston Theatre, and a waiter at Mayberry Ice Cream Shoppe.

34. Ms. Jones testified that had she known of vacancies at First Federal for the teller and branch teller positions, she would have applied for them.

35. The court finds that because employees were transferred into certain positions, it can be inferred that vacancies existed. Ms. Jones did not provide any evidence as to her qualifications for a particular position at a particular time.

36. Ms. Jones filed a charge with the Equal Employment Opportunity Commission (EEOC) on March 5, 1979. She received a right to sue letter on or about October 9, 1979. This action was filed on December 21, 1979.

---

**6.** Plaintiffs' Exhibits Nos. 27 and 39. Defendant's Exhibits Nos. 10 and 13. The court feels compelled to note at this point that plaintiffs' exhibits in a number of instances left something to be desired in terms of clarity and accuracy. The plaintiffs' position is not well served when the court must fish through piles of applications or attempt to find facts from material which is not well organized. Because of this method of presentation, defendant's counsel felt the need to counter with their own stacks of documents, which the court was obliged to sort out. The court will not do this again.

*Sherry Antone*

37.  Sherry Antone, a black female, was hired by First Federal on March 25, 1974 as a teller.

38.  Ms. Antone was a high school graduate who had gained some clerical experience in high school with the Neighborhood Youth Corps. Upon graduation from high school, Ms. Antone worked for the Experiment in Self Reliance, Inc. for one summer. She next worked for one year at Wachovia Bank and Trust Company in the Trust Investments Department. At Wachovia, she did general typing and filing. After that, Ms. Antone worked for five months as a cashier-receptionist at Household Finance, a loan company. Ms. Antone left Household Finance to have a child and did not work again full time until she began at First Federal.

39.  Ms. Antone was directed to First Federal by a private employment agency. Ms. Antone testified that she was told that First Federal was "looking for someone black."

40.  Ms. Antone worked as a teller at the main office until about April 1975, when she was transferred to First Federal's Stratford Road Branch. This move was not considered a promotion by First Federal because branch teller was not a promotion until the job levels were published in 1976.

41.  Ms. Antone had more responsibilities as a branch teller than she had at the downtown office. Her duties included assisting in issuing certificates of deposit and opening savings accounts for customers.

42.  Ms. Antone sometimes opened up the branch for the branch manager and sometimes had the key to the branch's safe. She did not, however, fulfill any of the more substantive duties of the branch manager, such as taking loan applications from customers. At this time, Ms. Antone was not qualified to be a branch manager.

43.  Around July of 1976, Ms. Antone was offered and accepted the position of loan secretary in the main branch. According-

ing to all accounts, she performed her duties well and could have in time become a loan officer.

44.  On June 24, 1977, Ms. Antone submitted a letter of resignation. Prior to that time, she had approached Ms. Hutchens and had questioned why First Federal did not pay more and did not publicize salaries. She asked whether First Federal was discriminating because of this. Ms. Hutchens testified that she told Ms. Antone that First Federal had a lower pay scale than larger companies in the area and that salaries were not publicized in order to protect the privacy of employees. Ms. Antone left First Federal to take a higher paying job at R. J. Reynolds Industries, also in Winston-Salem.

45.  Ms. Antone also named several employees whom she says were accorded better treatment than she by First Federal by being hired into a higher position or promoted instead of her.[7] These individuals included Ms. Paulette Moon, who was hired as a teller and later became teller supervisor; Ms. Patricia Frost, who was hired as a teller and later became a branch manager; Ms. Madeline Gibbons, who was hired as a teller; Ms. Judy Edwards, who was a receptionist, later transferred to a teller position, and then to the savings department; and Ms. Mary Jones, who was hired one month before Ms. Antone and who became office manager at the Mocksville branch. First Federal provided the following information about these individuals, which was unrebutted by the plaintiffs: Ms. Moon had a degree in data processing and had worked as a secretary for two years before coming to First Federal; Ms. Frost had approximately six years' experience with savings and loans and almost four years in banking; Ms. Edwards had been at First Federal, with one break in service, since 1960; Ms. Jones came to First Federal in January 1974 and had three years of college and one year of management experience. Other individuals with whom Ms. Antone sought to compare herself were Ms. Frances Ring, who had

---

**7.** Plaintiffs' Exhibits Nos. 28 and 41. Defendant's Exhibits Nos. 11 and 14. Ms. Antone also

saw fit to hand the court a pile of documents from which it was to determine facts.

three years of clerical experience and eleven years banking and savings and loan experience; Mr. Henry Howell, the branch manager in Mocksville, who had a four year business degree and twelve and one-half years' experience in banking; and Mr. Thomas Stevenson, who had a four-year degree in marketing and economics, and who had come to First Federal in 1972.

46. Ms. Antone testified that she was qualified to be a teller supervisor, office manager, branch manager (with training), and in the savings department. First Federal, during the relevant period, had one teller supervisor. The only office manager in the First Federal system was in Mocksville.

47. The court finds that because employees were transferred into certain positions, vacancies existed. Ms. Antone does not provide the court with any evidence aside from her assertions that she was qualified for any job she has listed.

48. Ms. Antone also had claims concerning discrepancies in pay. She claims that Mr. Stevenson was paid more for doing the same work and that, therefore, she is entitled to recover under the provisions of the Equal Pay Act. Mr. Stevenson was hired as a "trainee" in October 1972. Mr. Stevenson did teller work and occasionally filled in at the branches. It is during that time that Mr. Stevenson worked alongside Ms. Antone.

49. Ms. Antone has presented documentary evidence which the court assumes is intended to present further claims that she has concerning discrepancies in pay. This evidence consists of the pay records of Ms. Antone and several other employees. There was no attempt to clarify these records or to link them to any testimony offered by Ms. Antone. The court has inferred from an inspection of these documents that Ms. Antone's pay is to be compared to that of Ms. Judith Edwards, who was employed by First Federal in 1960.

50. Ms. Antone has never filed a charge with the EEOC.

*Sharon Leak*

51. Sharon Leak applied for a job with First Federal on August 23, 1978 and August 6, 1979.[8]

52. She listed the position applied for in 1978 as "secretary or general office."

53. At the time of her initial application, Ms. Leak was a high school graduate, who had received a degree from King's College in Charlotte, North Carolina. She was also taking business administration courses at Forsyth Technical Institute at night.

54. Ms. Leak had been employed at King's College in the summer of 1973 as a receptionist/typist for the school's director. She had been employed since July 1974 at New Bethel Baptist Church in Winston-Salem and was so employed in 1978 when she applied at First Federal. Her duties included typing, filing, and keeping the church's books. She could operate several office machines.

55. Ms. Leak was not contacted by anyone at First Federal and was not hired.

56. On September 25, 1978, two positions were filled by white females. Ms. Kathy Booe Ballard was hired as a teller. Ms. Pamela Elaine Rutledge was hired as a mail clerk.[9]

57. Ms. Ballard was a high school graduate, who had worked for two years as a cashier at a fast-food restaurant. Ms. Rutledge was a high school graduate, who had worked for several months doing payrolls, accounts receivable, and accounts payable at a data processing company, had been a part-time clerk at a clothing store, and had done some clerical work for McLean Trucking.

58. Ms. Ballard applied at First Federal on July 20, 1978. Ms. Rutledge applied at First Federal on September 1, 1978.

59. The written qualifications for teller at First Federal are as follows: six months to one year's experience (unspecified); high school or trade school education.

8. Plaintiffs' Exhibit No. 4. Defendant's Exhibit No. 2.

9. Plaintiffs' Exhibits Nos. 29 and 40. Defendants' Exhibits Nos. 12 and 15.

60. The written qualifications for mail clerk are no experience, and high school or trade school education.[10]

61. Ms. Leak was qualified for either the mail clerk or teller position.

62. Ms. Leak applied at First Federal again on July 30, 1979. She again filled out an application. She listed as the positions applied for "secretary, bookkeeper, or teller." At the time of this application, Ms. Leak was still employed at New Bethel Baptist Church.

63. Ms. Leak was not contacted at all by First Federal.

64. On August 27, 1979, a "floating teller" was hired at First Federal. A white female, Ms. Mary Hunter Ollice filled the position.

65. Ms. Ollice was a high school graduate, whose work experience included being a sales clerk, and a part-time teller at North Carolina National Bank for two years and three months.

66. Ms. Leak was qualified for the teller position, based on the written qualifications utilized by First Federal.

67. Ms. Ollice was qualified for the teller position and had more actual experience as a teller.

68. Ms. Leak did not file an EEOC charge.

*Other Anecdotal Evidence*

69. In addition to the three named plaintiffs, several other blacks testified who applied at First Federal, but who were not hired. Some of these individuals had business or banking related experience. Two, Mr. Walter Richmond III and Ms. Ether Simms Joe, were interviewed. The court does not find that their experiences give rise to an inference that First Federal discriminated against the named plaintiffs or black employees in general.[11]

70. Mr. Tyrone Scott, a former employee of First Federal, also testified at the trial. Mr. Scott was hired at First Federal on November 16, 1979 after graduating from the University of North Carolina at Charlotte with a degree in political science. He was placed in the proof department after a short while on the teller line. Mr. Scott scored "low" on a teller test which was administered to him by the Employment Security Commission. Mr. Scott remained in the proof department until he left First Federal on January 11, 1982. Mr. Scott does not appear to have suffered from any discrimination in hiring or job assignment.

71. Ms. Sheralee Smart Baker, a part-time employee at First Federal, testified that she had worked from October 1979 to May 1980 as a high school student participating in a cooperative education program. Ms. Baker worked at the main branch and was then transferred to the Robinhood branch. She stated that she failed to receive additional training and sufficient attention while at the branch and for that reason, declined an offer of full-time employment made to her by First Federal. The court does not find that Ms. Baker suffered any discrimination while at First Federal and that no inferences can be drawn from her experience which would lead to a finding of discrimination against the named plaintiffs.

72. Both Ms. Alfreta Jones and Ms. Antone testified that racial comments were made in their presence by an officer at First Federal. Ms. Jones stated that she had reported these comments to Mr. White, president. Mr. White did not recall such a report and indicated that racial slurs would not be tolerated by the company. Ms. Hutchens testified in the same fashion. Both noted that the official in question joked a lot. Mr. Stevenson, a former employee of First Federal, confirmed that racial comments were made, but that they were of a joking nature. He testified that in these situations, Ms. Jones was also heard to refer to white employees as "honkies" or "soda crackers." Mr. Stevenson's testimony was not rebutted.

---

10. Plaintiffs' Exhibit No. 26.

11. Plaintiffs' Exhibits Nos. 5 through 11 are the applications of these individuals.

*Statistical Evidence*

73. Both parties supplied to the court certain statistical information. The plaintiffs presented the testimony of Professor Mary Jane Williams, associate professor of mathematics and statistics at Winston-Salem State University. The defendant presented the testimony of Dr. Ephraim Asher, an associate professor of economics at Florida State University.

74. Professor Williams' testimony explained several exhibits intended to show that First Federal's employment practices resulted in disparate impact against blacks. The court has some doubt as to the probative value of the exhibits admitted for a number of reasons.

75. The plaintiffs' Exhibit No. 14 is designed to compare the percentage of minorities employed in the Forsyth County work force with the percentage of minorities employed at First Federal. Testimony elicited from Professor Williams indicated the problems that the court had with this exhibit.

The comparison includes white employees who were hired prior to the passage of Title VI. Professor Williams has also deleted First Federal's service workers from its work force, but has not done so in the benchmark to which the work force is compared. In addition, although the plaintiffs have used the years 1974 through 1979 for comparison, the percentage of minorities employed in the work force remains the same over a six-year period.[12] This percentage, if assumed to be accurate, includes all types of workers, skilled and unskilled, making no adjustments for the general financial skills that First Federal would be looking for. Finally, this exhibit limits the geographical area to Forsyth County, which the court finds unduly restrictive, considering that First Federal has a branch in Mocksville, and, at the very least, draws its employees from the Greensboro/Winston-Salem/High Point Standard Metropolitan Statistical Area (SMSA).

76. Plaintiffs' Exhibit No. 17 compared general population statistics and work force statistics with the work force at First Federal. The court finds general population statistics to be of minimal value in this case because no attempt has been made to classify blacks by age, occupation, skill, education, vocational training, or even inclination to work. In addition, the calculations are again based only on Winston-Salem and are purportedly 1980 figures while being compared to blacks at First Federal over a six-year period. The work force statistics are similarly flawed. In addition, what has been labeled "census" data is actually job service information from the North Carolina Employment Security Commission.

77. Plaintiffs' Exhibit No. 22, purporting to utilize the "Four-Fifths' Rule," is inaccurate, in that, the numbers of applicants were miscounted. Neither does the court find the defendant's calculations to be of assistance in this regard. Dr. Asher testified that the percentage of black hires to white hires during the period of 1977–1979 was ninety percent and thus well within the Four-Fifths' Rule. In attempting to reconstruct Dr. Asher's figures after trial, the court found that the figures were based on applicants from 1976–1980, and while the court could piece together the actual *hirees* from other exhibits, it had no such luck in ferreting out the total number of *applicants*.

78. Plaintiffs used Exhibit 23(a), as amended, to show disparity in hiring by First Federal in the clerical category in 1977.[13] The court finds that the use of a "static" number to show a hiring discrepancy is of little evidentiary value. The category of "clericals" includes job categories which would not be used at First Federal or any bank or savings and loan. The percentage would undoubtedly be smaller than the figure represented in the exhibit. "Minorities" includes races other than black, albeit to a small extent.

79. Dr. Asher's calculations were based on an analysis of First Federal's work force

12. Professor Williams testified that she obtained this information from the plaintiffs' counsel.

13. The original exhibit attempted to use 1977 figures for other years on the relevant period.

from January 1, 1976 through April 1, 1980 (the day on which he initially saw First Federal's employment records). Dr. Asher utilized both static and applicant flow methods to analyze First Federal's hiring, promotion, and job placement practices during this period.[14] After a review of these calculations, the court could not determine that they were either inaccurate or inapplicable to the instant case in terms of benchmarks or the relevant geographical area.

80. First Federal had a small work force during the relevant period. Applications were received from 344 people. Black people accounted for sixty-two of the applicants. First Federal hired fifty-four people, of whom nine were black.

81. Ms. Hutchens indicated at trial that during the relevant period, savings and loans positions were offered to three black people. These offers were not accepted. In one of these instances, Ms. Hutchens tried to reach an offeree by telephone and by letter to come in for an interview, but did not succeed.

### Discussion

This is a disparate treatment case. As explained in *Wright v. National Archives and Records Service,* 609 F.2d 702, 713 (4th Cir. 1979), the disparate treatment theory is applicable "where an 'employer simply treats some people less favorably than others because of race'; which means that '[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of difference in treatment.'"

The burden of proof of the parties in a disparate treatment case was set forth in *Ambush v. Montgomery County Department of Finance Division of Revenue,* 620 F.2d 1048, 1052 (4th Cir. 1980):

The resolution of a disparate treatment case depends on the successive disposition of three issues, in which the burden of proof varies from party to party in the controversy. This was the procedure required by *McDonnell Douglas. Thus the plaintiff has the burden of showing the prima facie case of racial discrimination. She may do this merely by showing (1) that there was a vacancy (2) for which the plaintiff, a black, was qualified, but that (3) she was rejected and (4) that the job remained open or a white was given the job.* McDonnell Douglas Corp. v. Green, 411 U.S. [792] at 802, 93 S.Ct. [1817] at 1824 [36 L.Ed.2d 668]. *The defendant, in turn, may rebut such prima facie showing by* " 'explain[ing] what he [the employer] has done or produc[ing] evidence of legitimate nondiscriminatory reasons,' " *for what he did. Board of Trustees v. Sweeney,* 439 U.S. [24] 25 n. 2, 99 S.Ct. [295] 296 [58 L.Ed.2d 216]. *Assuming that the defendant has made such a showing the burden then shifts to the plaintiff to establish that the "reasons" assigned by the defendant for his action were pretextual and a mere cover for racial discrimination. Smith v. Flax,* (4th Cir. 1980) 618 F.2d 1062. (Emphasis added.)

The court concludes after a review of the evidence in this case that Ms. Jones and Ms. Antone have failed to show that they have met the prerequisites necessary in order to make out a *prima facie* case of discrimination in promotions. The plaintiffs, black females, have arguably shown that vacancies existed for which they could have been considered. They have *not* shown, however, that they possessed the qualifications for the positions to which they aspired, especially those in management. Their experience in the savings and loan field was limited. An employer breaks no law in seeking to fill its management positions with the most qualified and experienced people:

When . . . the pool from which supervisors are to be selected is the hourly paid work force, one naturally and inevitably looks to those who have acquired experience and demonstrated skills. The greater the experience and the greater the number of demonstrated skills, the more appropriate it is for consideration to focus

---

**14.** Defendant's Exhibit No. 7.

upon a particular individual. *One does not look for supervisors at the bottom rung of the ladder; it is at the top where any search may be expected to produce fruitful results.* (Emphasis added.)

*Hill v. Western Electric Co., Inc.*, 596 F.2d 99, 105 (4th Cir. 1979).

The savings and loan industry, like the banking industry in *E.E.O.C. v. United Virginia Bank/Seaboard National*, 615 F.2d 147 (4th Cir. 1980), requires employees with specific skills and/or experience. In *United Virginia Bank*, 615 F.2d at 153, the court emphasized that "[i]t is simply not realistic to say that every member of the labor force has the qualifications to be a bank teller for example. *It is even more unrealistic to say that every member of the labor force has the qualifications to be a bank manager or official.*" (Emphasis added.)

Ms. Jones and Ms. Antone listed several white individuals whom they thought had received better treatment in promotions than they. In each case, the individual listed, because of education, experience, or both, possessed qualifications justifying the indicated promotion or transfer. They each had qualifications superior to those of Ms. Jones or Ms. Antone. Even if the court were to accord full credit to Ms. Jones' and Ms. Antone's testimony, they were, at best, only arguably equally as qualified as the individuals named by them. These individuals were not less qualified than either of these plaintiffs. In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court elaborated upon the principles of *McDonnell Douglas* and emphasized that in a promotion or a hiring case, a claimant must show not only that another person was hired for an opening but also that the qualifications of the person hired were less than, not merely equal to, those of the claimant:

> The Court of Appeals also erred in requiring the defendant to prove by objective evidence that the person hired or promoted was more qualified than the plaintiff. *McDonnell Douglas* teaches that it is the plaintiff's task to demon-

strate that similarly situated employees were not treated equally. 411 U.S., at 804 [93 S.Ct. at 1825]. The Court of Appeals' rule would require the employer to show that the plaintiff's objective qualifications were inferior to those of the person selected. If it cannot, a court would in effect, conclude that it has discriminated.

The Court's procedural rule harbors a substantive error. Title VII prohibits all discrimination in employment based upon race, sex and national origin. "The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and . . . neutral employment and personnel decisions." *McDonnell Douglas, supra*, at 801. *Title VII, however, does not demand that an employer give preferential treatment to minorities or women.* 42 U.S.C. § 2000e–2(i). See, *Steelworkers v. Weber*, 443 U.S. 193, 205–206 [99 S.Ct. 2721, 2728, 61 L.Ed.2d 480] (1979). *The statute was not intended to "diminish traditional management prerogatives."* Id., at 207 [2729]. It does not require the employer to restructure his employment practices to maximize the number of minorities and women hired. *Furnco Construction Co. v. Waters*, 438 U.S. [567] at 577–578 [98 S.Ct. 2943, 2949–2950, 57 L.Ed.2d 957].

> *The views of the Court of Appeals can be read, we think, as requiring the employer to hire the minority or female applicant whenever that person's objective qualifications were equal to those of a white male applicant. But Title VII does not obligate an employer to accord this preference. Rather, the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria.* The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination. *Loeb v. Textron, Inc., supra*, [600 F.2d 1003] at 1012 n. 6; see *Lieberman v.*

*Gant,* 630 F.2d 60, 63 (CA2 1980). (Emphasis added.)

*Id.* 450 U.S. at 258–59, 101 S.Ct. at 1096–97. Thus, the testimony of Ms. Jones and Ms. Antone in this regard falls short of a showing of discrimination.

The job assignment claims of Ms. Jones and Ms. Antone are also unsupported by the evidence. The same prerequisites for presenting a *prima facie* case from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), apply to these claims. As pointed out in *Wright v. National Archives, supra,* 609 F.2d at 715 n. 15, "*McDonnell Douglas* is not confined to hiring but is to be applied, flexibly adapted, to any claim of disparate treatment." Ms. Jones and Ms. Antone have contended that females and blacks were "tracked" into certain lower paying jobs. They have failed to make any showing that they personally were assigned unfairly or in a discriminatory fashion other than to contend without specification that they should have been promoted to management. Moreover, the testimony of Dr. Asher demonstrates that his examination of First Federal's employment records revealed no evidence of general discrimination in job assignments.

Ms. Antone contends that Mr. Stevenson received higher pay than she received for equal work. It is apparent, however, that Mr. Stevenson had significantly more business related education when he was hired than did Ms. Antone, that he had worked at First Federal for almost two years before Ms. Antone was hired, and that it cannot be said that he performed the exact same job as Ms. Antone, although he filled in as a teller when Ms. Antone was working in that capacity. Ms. Antone contends also that Ms. Judith Edwards was paid more than she and that Ms. Edwards was in a lower salary grade. Again, it must be noted that Ms. Edwards had been at First Federal a number of years prior to Ms. Antone. In addition, the salary grades and their concomitant pay ranges were not established until 1976. The court has no evidence before it from which it can determine the pay range

for Ms. Edwards' job and whether she was paid more to Ms. Antone's detriment. Finally, there is no indication of the content of Ms. Edwards' job while Ms. Antone was a teller and loan secretary. She was listed initially as a receptionist. Neither job titles nor descriptions are dispositive in cases alleging discrepancies in pay. *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041 (5th Cir. 1973), *cert. denied,* 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973).

The Equal Pay Act provides relief against employers who discriminate between employees "on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). Ms. Antone has alleged and Mr. Stevenson has so testified that they both performed teller work at some point. The evidence has shown that teller work generally requires the same skills. The court is not convinced, however, that Mr. Stevenson was doing *only* teller work during the period when Ms. Antone was a teller. Neither can the court ignore the two years Mr. Stevenson worked at First Federal before Ms. Antone was employed. Finally, it cannot ignore Mr. Stevenson's four-year degree in marketing and economics. An employer may pay a higher starting salary to one who has education or experience relative to the job to be performed. *Herman v. Roosevelt Federal Savings and Loan Association,* 432 F.Supp. 843 (D.C. Mo. 1977), *aff'd,* 569 F.2d 1033 (8th Cir. 1978). Ms. Antone has not, therefore, established a case under the Equal Pay Act.

Title VII also prohibits discrimination in pay and in this case applies to Ms. Antone's claims concerning Thomas Stevenson and Judith Edwards. (Her claims concerning Ms. Edwards are, of course, based on race.) The Fourth Circuit enumerated the prerequisites for making a *prima facie* showing in a Title VII equal pay claim in *Stastny v.*

*Southern Bell Telephone and Telegraph Co.,* 628 F.2d 267, 281 (4th Cir. 1980):

> The named plaintiffs' evidence did not attempt to show that within these classes the actual positions held by each during the periods of comparison required skill, effort and responsibility substantially equal to that required to perform the actual positions held by the males whose salaries were compared. Southern Bell contends that this constitutes a total failure of proof of the claims under applicable statutes and decisional law. We agree. 42 U.S.C. §§ 2000e–2(a), (h); *Keyes v. Lenoir Rhyne College,* 552 F.2d 579 (4th Cir. 1977) (comparisons with males holding common title of "professor" insufficient because not shown to involve substantially equal work); *see also Orr v. Frank A. MacNeill & Son, Inc.,* 511 F.2d 166, 170–71 (5th Cir. 1975); *Ammons v. Zia Co.,* 448 F.2d 117 (10th Cir. 1971).

The court has already noted that Ms. Antone has not proved a case as to her Equal Pay Act claim. The same is true as to her claims under Title VII. The court has already addressed its doubts concerning Mr. Stevenson. Ms. Antone has also failed to present sufficient evidence concerning Ms. Edwards aside from her allegations that Ms. Edwards was in a lower salary grade. The court concludes that Ms. Antone cannot recover under Title VII for differences in pay.

*Sharon Leak*

■ The court has indicated that Ms. Leak was qualified to fill positions at First Federal when she applied in 1978 and in 1979. In order to establish a *prima facie* case of employment discrimination, Ms. Leak must show (1) that she belongs to a racial minority, (2) that she applied and was qualified for a job for which the employer was seeking applicants, (3) that despite her qualifications, she was rejected, and (4) that after her rejection, the position remained open, and the employer continued to seek applications from persons of Ms. Leak's qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824

(1973); *Ambush v. Montgomery County Board of Education,* 620 F.2d at 1052.

Ms. Leak has established a *prima facie* case of discrimination. Ms. Leak has established that she is a member of a racial minority, that she applied and was qualified for a job for which the defendant was seeking applicants, that she was not selected, and that the defendant chose white people to fill the vacancies. In 1978, a mail clerk position and teller position were open, and in 1979, a teller position was open.

As Ms. Leak has established a *prima facie* case, First Federal must articulate a legitimate nondiscriminatory reason for not hiring her. First Federal "need not persuade the court that it was actually motivated by the proffered reasons. (Citation omitted.) It is sufficient if [First Federal's] evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

First Federal has contended through the testimony of Ms. Hutchens that Ms. Leak was not qualified for either position that was filled. Ms. Leak retains the burden of persuasion in this case. As stated by the Court in *Burdine:*

> She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. See *McDonnell Douglas,* 411 U.S., at 804–805 [93 S.Ct. at 1825–1826].

*Id.* 450 U.S. at 256, 101 S.Ct. at 1095.

Ms. Leak has carried the burden of persuasion by showing (1) that she met the optimum qualifications of the defendant for the available positions, (2) that she was more qualified than the white persons who

were hired, and (3) that she was not interviewed when the whites who were hired were interviewed.

First Federal had written standards which, according to Ms. Hutchens, listed the optimum qualifications for each job. Ms. Leak's qualifications in terms of education and experience were greater than the written optimum qualifications of First Federal for both the teller and mail clerk positions which were filled on September 25, 1978. The defendant's proffered reason for rejection based on a lack of qualifications is rebutted by its own written standards. Second, when the court compares the qualifications of Ms. Leak with the two white females who were hired, Ms. Ballard and Ms. Rutledge, Ms. Leak had more education and work experience. Both white females were just high school graduates. Ms. Ballard had worked at McDonald's as a cook and cashier on a part-time basis while in high school. Besides a couple of part-time jobs in high school, Ms. Rutledge had worked only six months as a payroll and accounts clerk for a data processing company. She had only finished high school.

Ms. Leak, on the other hand, was a graduate of King's College with a degree in modern office training. She had attended Forsyth Technical Institute at night for two years and had studied relevant business courses. She was working as a secretary and bookkeeper for a church in Winston-Salem. Her qualifications were superior to the two whites hired on September 25, 1978.

Finally, Ms. Leak was not interviewed. Had she at least received an interview and been found wanting in oral skills or personality, perhaps the defendant's assertion of lack of qualifications would carry more weight. But as she obviously had the written qualifications required by the defendant, not to accord Ms. Leak an interview in 1978 was discriminatory. *Gillin v. Federal Paper Board Co.,* 479 F.2d 97 (2d Cir. 1973). The court is in no way holding that every employer is bound to interview every applicant for a position. That would be a heavy burden for any employer and would be especially onerous for a company the size of First Federal. In the instant case, however, Ms. Hutchens testified that in filling vacancies, she looked over applications going back several months. She considers the qualifications listed on those applications. Surely Ms. Leak had the necessary qualifications, at least on paper. It is certain that the white females hired were less qualified. The evidence thus leads the court to the only conclusion possible—that First Federal did not hire Ms. Leak because of her race.

Ms. Leak has also established a *prima facie* case with reference to her 1979 application. First Federal has again indicated that Ms. Leak was not qualified for the job. In 1979, however, the white person did have actual teller experience. The court concludes that First Federal did not discriminate against Ms. Leak in not hiring her on this occasion.

First Federal contends that Ms. Antone and Ms. Leak cannot prevail on their Title VII claims because they have failed to file a charge with the EEOC as required by 42 U.S.C. § 2000e–5(e). This court has determined that this is not a class action and the claim of each plaintiff must stand or fall upon its own merits. Of course, Ms. Antone's claims have been found to have no merit by this court. Ms. Leak has, however, established discrimination against her by First Federal.

Ms. Leak sued for relief along with Ms. Jones, who did file a timely charge with the EEOC. The Fourth Circuit has recently noted that the decisions have been somewhat confusing in determining how situations such as these are to be treated. *Dalton v. Employment Security Commission,* 671 F.2d 835, 838 (4th Cir. 1982). The more liberal of the decisions have upheld the standing of a non-charging plaintiff if his (or her) claim is "substantially identical" with that of another plaintiff who has standing to sue. *Crawford v. United States Steel Corp.,* 660 F.2d 663, 665–66 (5th Cir. 1961). In the instant case, Ms. Leak's claim is *not* substantially identical with Ms. Jones' claim. Ms. Leak has charged discrimination in hiring, while Ms. Jones' claim concerned job assignments and promotions. Ms.

Leak's claim under Title VII must therefore be dismissed. (Ms. Antone would retain standing under Title VII. Her claim has been found by this court to be meritless.)

Ms. Leak's claim under § 1981 remains viable, however, as filing with the EEOC is not a condition to the right to maintain an action under that provision. Ms. Leak's establishment of a *prima facie* case under *McDonnell Douglas* is fully applicable to § 1981. *Crawford v. Western Electric Co.,* 614 F.2d 1300, 1311 (5th Cir. 1980).

*Statistical Evidence*

In a case such as this, the court should view the plaintiffs' evidence, both statistical and anecdotal, and determine whether that evidence will support an inference that if such actions remain unexplained, it is more likely than not that such actions were based on a discriminatory criterion illegal under the law. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The court has already determined that with the exception of the evidence concerning Ms. Leak individually, plaintiffs have not presented testimonial evidence which would give rise to an inference of discrimination.

The plaintiffs' efforts at presenting a statistical showing of a pattern of discrimination were also unpersuasive. The statistical presentation of the plaintiffs was consistently based upon the premise that special qualifications for working in a financial institution like the defendant were unimportant. Professor Williams routinely used benchmark groups for comparison to First Federal's work force which included significantly large numbers (and correspondingly high percentages) of individuals who would have been totally unqualified to work at First Federal. It cannot properly be assumed that everyone in the work force is qualified to work at a financial institution. This principle was endorsed in *E.E.O.C. v. United Virginia Bank/Seaboard National, supra,* in which the Fourth Circuit added financial institutions such as First Federal to the list of employers whose businesses require special qualifications as a matter of law. In *United Virginia Bank,* the EEOC attempted to show discrimination by comparing the bank's work force with the population as a whole without a showing as to the percentage of individuals in that work force who might be qualified to work in such an institution. In soundly rejecting the EEOC's contentions, the court explained:

> The fundamental problem with EEOC's statistical evidence lies in the fact that UVB's work force was compared with the work force as a whole. As the district court correctly recognized, this comparison was improper. It is clear that:
>
> > When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.
>
> *Hazelwood School District v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977). Accord, *Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Indeed, we spelled out this proposition in our opinion on the first appeal in this case. *EEOC v. United Virginia Bank/Seaboard National,* 555 F.2d 403, 406 n. 7 (1977). The district court followed our opinion on remand and held that the proper comparison was between UVB's work force and those individuals with the requisite qualifications for the particular job.
>
> The EEOC, however, *rigidly continues to argue that all the black local labor force is qualified for the office and clerical positions at UVB. This is simply not true. Tellers must be able to deal with the public, handle and account for money, and operate adding machines, typewriters and other office machines.* (Emphasis added.)
>
> *  *  *  *  *  *
>
> A bank can hardly be said to be a typical employer with its emphasis on books, bookkeeping, and business machines, not to mention the considerable skill in deal-

ing with money matters required of many of its employees.

615 F.2d at 149–151.

By using a general labor force in arriving at a benchmark for comparison to First Federal's work force and by using other inaccurate methods previously set forth in the findings of fact, the plaintiffs have adjusted their calculations to such an extent that those calculations lack both credibility and validity. It is an elementary principle of law that one must use comparable groups for statistical analyses, free from variables which would undermine the reasonableness of the inferences drawn. *Mazus v. Department of Transportation,* 629 F.2d 870, 875 (3rd Cir. 1980).

The court must also consider the size of First Federal's work force. During the relevant period, First Federal had approximately sixty employees. During that time, there were 344 applications, of which sixty-two were from blacks. There were fifty-four people hired, of whom nine were black. The court acknowledges that First Federal's size should not insulate it from scrutiny as to its employment practices. A small sample size can, however, detract from the value of statistical evidence. *Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1857 n. 20, 52 L.Ed.2d 396 (1977). First Federal attempted to hire three black people. In addition, although its clerical work force seemed to turn over fairly rapidly, several of its top managers were hired prior to the passage of Title VII. These individuals should be excluded from any statistical calculations. *United Virginia Bank,* 615 F.2d at 150. The plaintiffs did not do this. These factors combined with the plaintiffs' use of inaccurate benchmarks to severely detract from any weight their statistics should be given.

Dr. Asher's analysis of First Federal's work force was generally thorough, credible, and much more persuasive to the court. His use of the applicant flow method (the comparison of hires to applicants) in addition to the static work force figures was a more accurate way of reviewing First Federal's practices. The court found that First Federal is a small institution which generally used walk-ins to make up its work force and generally promoted from within. The defendant's statistics properly took those factors into consideration. Dr. Asher concluded that there is no evidence of a statistical inference of discrimination in First Federal's employment practices. The court concurs in that analysis.

The court has noted previously that this is not a disparate impact case. The plaintiffs have contended that the defendant's total selection process had a disparate impact on blacks. It cannot be said that the use of an application and interview prior to hiring was a facially neutral practice which operated to exclude blacks. It has not been shown that these requirements were unrelated to job performance. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). It has not been shown that they operated as "built-in headwinds" for blacks applying to First Federal. *Griggs,* 401 U.S. at 432, 91 S.Ct. at 854. If anything, the subjectivity allegedly utilized by Ms. Hutchens and Mr. White in hiring employees, at least from the evidence adduced at trial, would more logically lead to a finding of disparate treatment. The court, while recognizing the possibility of discrimination in hiring when two white officials have total discretion, does not find sufficient evidence to indicate that such discretion has resulted in company-wide discrimination against blacks.

The court has already noted that it is not inclined to give any deference to the Four-Fifths' Rule urged upon it by the plaintiffs. The rule provides that a selection rate for, in this case, blacks, which is less than four-fifths (or eighty percent) of the selection rate of whites will be generally regarded as evidence of adverse impact. Differences in selection rate may not demonstrate adverse impact if the differences are based on small numbers and are not statistically significant. 29 C.F.R. § 1607.4(D) (1981). The rule is a federal agency standard and is not binding on this court. It was explained in *Rich v. Martin Marietta Corp.,* 467 F.Supp. 587, 611–12 (D. Col. 1979):

Plaintiff relied, first, upon the ⅘'s Rule. It should be noted at the outset that this rule is not, strictly speaking, a "statistical" method at all. It is no more or less than a straightforward comparison of raw percentages, with a mechanical rule of thumb then applied in a regular manner so as to substitute uniformity for the "flexibility" *(see,* note 27, *supra)* which has characterized other such ball park comparisons. It has the virtue of simplicity and, as it has been uniformly adopted by four federal agencies, it has the companion virtue of providing the potential for predictability of results in discrimination cases. The rule should not, however, be given deference beyond its due. Its narrow primary use is clearly set forth in the explanatory information which emphasizes that the rule does "not address the underlying question of law. [It] discuss[es] only the exercise of prosecutorial discretion by the Government agencies themselves." 43 Fed. Reg. at 38291. (1978) (footnote omitted). Again, it is noted that "rule of thumb" is *not a legal definition of discrimination,* rather it is a practical device to keep the attention of enforcement agencies on serious discrepancies . . . ." *Id.* (emphasis added).

It is apparent that, while by no means conclusive, the ⅘'s Rule might well produce some evidence of discrimination. In determining how much weight to give such evidence, we are guided, in part, by the observation that "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters, supra,* 431 U.S. at 340, 97 S.Ct. at 1856, 1857 (citation omitted). In the context of the case at hand, we could well say that, if the ⅘'s Rule calculations were all the evidence we had before us, we might well find them to be highly persuasive and we might seriously consider using the benchmarks developed by the government agencies to help interpret the figures. But, while it may supply an inference of discrimination, the inference of the ⅘'s Rule (resting, as it does, upon untested intuition) is not a strong one. And, while the ⅘'s Rule may produce some evidence of discrimination, we are confident that the binomial distribution (approved by the Supreme Court, and the Tenth Circuit, and used by defendant) produces much better evidence. [Footnotes omitted.]

Because there is sufficient evidence before the court using more reliable statistical methods, the Four-Fifths' Rule need not be used. At any rate, the court has some doubts as to the accuracy of the calculations used by both parties and will not rely on either set of figures.

It is correct that the defendant engages in employment practices which might be used in a discriminatory fashion. First Federal did not post jobs or vacancies, and as mentioned before, the individuals charged with hiring employees were white. Applicants were asked to list on their applications individuals they might know at First Federal. First Federal relied mainly on walk-ins with occasional listings with the Employment Security Commission and at least one referral from the Winston-Salem Urban League (a black organization). Such practices, however, are not violative of Title VII *per se.* Generally, "where . . . an imbalance in the work force has been statistically shown, the uses of particular hiring practices are then to be assessed for their tendency to perpetuate that imbalance." *E.E.O.C. v. American National Bank,* 652 F.2d 1176, 1198 (4th Cir. 1981). Here, no such imbalance has been shown, and the court does not find that the aforementioned practices are discriminatory in and of themselves.

The court concludes that neither Ms. Jones nor Ms. Antone were subjected to discriminatory treatment in the form of racial joking while employed by the defendant. While there was some evidence that light comments of a racial nature were occasionally made in the plaintiffs' presence, the unrebutted testimony of First Federal's president, Mr. White, and that of Mr. Ste-

venson leads the court to conclude (1) that such practices were neither condoned nor tolerated by the defendant and (2) that such comments were sophomoric, but nevertheless innocent, attempts at humor engaged in reciprocally by both whites and the plaintiffs, Ms. Jones and Ms. Antone. Apparently, at least Ms. Jones willingly engaged in such exchanges, as evidenced by her on occasion jokingly referring to whites as "honkies" or "soda crackers."

The court does not find that the testimony of individuals other than the plaintiffs illustrated that First Federal "betrayed in other matters a predisposition towards discrimination against members of the involved minority." *Thompson v. McDonnell Douglas Corp.*, 416 F.Supp. 972, 981 (E.D. Mo. 1976), *aff'd*, 552 F.2d 220 (8th Cir. 1977). Based on the foregoing findings of fact and discussion, the court makes the following conclusions of law.

### Conclusions of Law

1. The court has jurisdiction of this action pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e, *et seq.*

2. First Federal Savings and Loan Association of Winston-Salem is an employer as that term is defined by Title VII of the Civil Rights Act of 1964.

3. First Federal did not violate Title VII of the Civil Rights Act of 1964 or 42 U.S.C. § 1981 by failing to promote Ms. Alfreta A. Jones to higher positions.

4. First Federal did not violate Title VII of the Civil Rights Act of 1964 or 42 U.S.C. § 1981 by failing to promote Ms. Sherry W. Antone to higher positions.

5. First Federal did not violate Title VII of the Civil Rights Act of 1964 or 42 U.S.C. § 1981 by failing to assign Ms. Alfreta Jones to a higher position when she was hired.

6. First Federal did not violate Title VII of the Civil Rights Act of 1964 or 42 U.S.C. § 1981 by failing to assign Ms. Sherry W. Antone to a higher position when she was hired.

7. First Federal did not violate Title VII of the Civil Rights Act of 1964 by paying Ms. Sherry Antone a different wage than either Mr. Thomas Stevenson or Ms. Judith Edwards.

8. First Federal did not violate the Equal Pay Act of 1963 by paying Ms. Sherry W. Antone a different wage than Mr. Thomas Stevenson.

9. Ms. Sharon Denise Leak cannot recover from First Federal pursuant to Title VII of the Civil Rights Act of 1964 because she did not file an EEOC charge.

10. First Federal violated 42 U.S.C. § 1981 by failing to hire Ms. Sharon Leak as either a mail clerk or teller in September 1978. She can recover under that provision.

11. Ms. Sharon Leak is entitled to receive what she would have made as a teller or mail clerk from September 28, 1978 until the date of entry of this judgment offset by earnings received from other employment.

12. The evidence in this case clearly shows that Ms. Sharon Leak is not entitled to punitive damages.

13. The evidence in this case does not call for any injunctive relief.

14. Upon reconsideration of plaintiff's renewed motion for class certification and based on the additional evidence adduced at trial, the court does not find any company-wide pattern of racial discrimination and will not certify a class.

15. Counsel are directed to attempt to agree on a computation of the back pay award outlined in these conclusions of law and to report to the court within thirty days of the entry of these findings of fact and conclusions of law. If the parties cannot agree upon the amount of the back pay award, the court will resolve the matter.

16. Judgment will be deferred until the matter of the back pay award is determined.

17. The plaintiffs are entitled to an award of attorney's fees incurred. A separate order will be entered in this regard after the plaintiffs submit a fee petition. The plaintiffs shall have thirty days after

the entry of these findings of fact and conclusions of law to submit their petition.

18. A separate order will be entered concerning the taxing of costs.